MULLANEY, WELLS & CO., Plaintiff-Appellant and Cross-Appellee, *v.* BERNARD A. SAVAGE, JR., *et al.*, Defendants-Appellees and Cross-Appellants.—(GLEN ELLYN CORPORATION, Defendant-Appellee.)

First District (1st Division)   No. 76-198

Opinion filed November 6, 1978.—Rehearing denied December 11, 1978.

James L. Perkins and John L. Huff, both of Chicago (Winston & Strawn, of counsel), for appellant.

Francis B. Stine, of Chicago (Brown, Stine, Cook & Hanson, of counsel), for appellee Barnard A. Savage, Jr.

Thomas G. Poulakidas, of Chicago (Poulakidas, Poulakidas & Wood, of counsel), for appellee S. C. Williams, Jr.

Mr. JUSTICE BUCKLEY delivered the opinion of the court:

This case began in 1963 as an action in chancery for an accounting and to impose a constructive trust on proceeds of certain transactions by the defendants on the grounds that they had their origin in a breach by defendant Savage of fiduciary duties owed by him to plaintiff, Mullaney, Wells & Co.

The procedural history of this case is as follows:

The plaintiff's second amended complaint was referred on February 26, 1965, to a master in chancery. Sixteen witnesses appeared and four depositions were admitted before proofs were closed on September 12, 1968. The master submitted his preliminary report and findings on February 1, 1971, finding for the plaintiff, and the defendants filed numerous objections.

Before the master could rule upon the objections, he was appointed and took office as a magistrate of the Circuit Court of Cook County. Thereupon, defendants moved that he be disqualified from taking any further action in this case, and that a trial *de novo* be ordered. The trial court ordered that the master certify the record and his preliminary report, and further ordered that it would pass upon defendants' objections. Defendants objected to the trial court's order and this court permitted an appeal. In its opinion (*Mullaney, Wells & Co. v. Savage* (1972), 5 Ill. App. 3d 1, 282 N.E.2d 536), this court reversed the order of the trial court insofar as it held that the master was disqualified from continuing to the completion of the case.

Upon remand, the master considered and then substantially overruled defendants' objections. Defendants refiled their same objections as exceptions to the master's report. Glen Ellyn also filed another motion for trial *de novo,* again challenging the jurisdiction of the master but on additional or different grounds. In an order dated September 6, 1974, the trial court ruled that (1) "the exceptions of the defendants to the said master's report are sustained and the said report is held for naught"; and (2) "the motion of defendant Glen Ellyn Corporation for a trial *de novo* is sustained and this cause shall be retried, a new trial being hereby ordered."

Plaintiff petitioned this court for leave to appeal under Supreme Court Rule 306 (Ill. Rev. Stat. 1975, ch. 110A, par. 306), from an interlocutory order granting a new trial. This court granted plaintiff's petition and, in its opinion (*Mullaney, Wells & Co. v. Savage* (1975), 31 Ill. App. 3d 343, 334 N.E.2d 795), reversed the provisions of the trial court's order holding the master's report for naught and granting a new

trial. The court based its decision on several grounds, including *res judicata*. The court further held that, in appeals under Rule 306, it did not have authority to review that provision of the trial court's order sustaining defendants' exceptions to the master's report, nor could it determine the rights of the parties on the merits. The court ordered the trial court to enter judgment and conduct further proceedings consistent with its opinion. On January 12, 1976, the trial court entered a final decree dismissing the action for want of equity.

On appeal, two issues are presented: (1) Whether the decree of the chancellor dismissing this action was proper under the law and evidence; and (2) whether the law firm of Winston & Strawn should have been barred from representing the plaintiff because it formerly represented one of the defendants in this action.

The evidence relating to these issues is as follows:

Mullaney, Wells had been in the investment banking business since 1938. It specialized in the sale and distribution of municipal securities, but was also a general investment banking firm dealing in all types of securities. In 1957, when its relationship with Savage began, Mullaney, Wells had no department or division which exclusively handled corporate or industrial securities transactions. Instead, various people in plaintiff's organization worked part-time on such transactions as they developed.

When Savage first contacted Paul Mullaney he had been working for approximately two years for a consulting firm at a salary of $500 per month. Savage submitted a brochure to Mullaney setting out his suggestion for a "Proposed Industrial Financing Department" and indicating the type of securities transactions which he proposed to solicit and develop on plaintiff's behalf:

> "PROPOSED INDUSTRIAL FINANCING DEPARTMENT
> "PROPOSED
> This brief presentation is intended to provide a background pertinent to opportunities for profit in private placement and investment banking functions in the industrial field and how such opportunities can be capitalized into interesting profits.
> OBJECTIVES
> 1. Originate, negotiate and facilitate private placements.
> 2. Originate and participate in corporate underwritings.
> 3. Undertake the sale and/or acquisition of going concerns for merger or direct sale purposes."

After a second meeting between Savage and Mullaney in which they discussed compensation, Savage prepared in his own handwriting an agreement, dated September 19, 1957:

> "Agreement between Paul L. Mullaney, President of Mullaney, Wells & Co. and Barnard A. Savage, Jr.

1. Nature of Agreement—An understanding has been reached whereby Barnard A. Savage, Jr. will become affiliated with Mullaney, Wells and Co. to undertake the establishment and direction of an 'industrial financing division'. The function of this newly created division will principally focus on activities involving the organization and negotiation of private placements and the underwriting of corporate securities in the industrial field.

2. Remuneration—Six thousand dollars ($6,000) per annum, payable to Barnard A. Savage, Jr., to be deducted from divisional gross revenues at the conclusion of each calendar year.

3. Division of Net Profits—At the conclusion of each calendar year, total net profits, after deducting all operating expenses accrued by the 'industrial financing division' and after deducting the salary taken by Barnard A. Savage, Jr., will be divided on a 50-50 basis between Mullaney, Wells & Co. and Barnard A. Savage, Jr.

4. Duration of Agreement—Both parties concur to appraise this agreement and make such adjustments as the facts and circumstances may warrant at the conclusion of the first year of operations. This agreement is subject to cancellation by either party at any time."

/s/ Barnard A. Savage, Jr.
/s/ Paul L. Mullaney"

Savage started working immediately, and was paid his $6,000 per year draw. Savage was given a position in the company's conference room from which to operate, and was later given a stenographer's desk. When the conference room was being used Savage had to vacate. Savage's supervisor testified before the master that Savage's primary function "was to go out and find deals." Accordingly, he spent the majority of his time outside the office. Savage testified that he had no regular hours and that no control by the company was exercised over him. In the 3½ years of Savage's affiliation with Mullaney, Wells he never received a vacation, a bonus, nor an increase in his draw.

Savage worked for plaintiff from September 1957 until he resigned on March 28, 1961. In 1957 and 1958 Savage contributed to two transactions within Mullaney, Wells' office. The first transaction involved plaintiff's purchase of all the outstanding common stock of the Arlington Heights Bank. The opportunity to purchase the stock had been brought to plaintiff by one of its employees and negotiations had gone on for about two years before Savage started working for plaintiff. There was conflicting testimony regarding the extent of Savage's involvement in consummating the transaction. Plaintiff's president testified that Savage was not really involved and merely accompanied employees to the bank on two occasions. Contrary testimony was given by Savage himself and

some of plaintiff's employees. Savage requested financial recognition for his services in the transaction despite the fact it was beyond his functions under his contract. Savage testified that his request for compensation was refused by Mullaney, Wells because he had not initially procured the deal and that it was not a "private placement" within the purview of his contract. Plaintiff's president testified no compensation was ever requested by Savage and that no profit on the stock was credited to Savage's account.

At plaintiff's 1959 Christmas party, at which Savage and the entire staff of Mullaney, Wells were in attendance, Paul Mullaney announced that the company had experienced a poor year and bonuses reflected this slump, but that it was fortunate that the men could engage in transactions for their own account to supplement their income. At trial, plaintiff's former vice president corroborated this testimony.

In the Berry Steel Door Company transaction, Savage, in January 1958, spent considerable time with plaintiff's vice president on the placement of that company's new bonds. The initial contact of the client company had also been made before Savage joined Mullaney, Wells. However, there was no dispute that Savage made a significant contribution to the closing of the transaction by developing a valuable contact with the Prudential Insurance Company in March 1958. Savage considered this a "private placement" and felt entitled to 50% of the $28,000 fee. Mullaney, Wells refused Savage's request since Savage had not "found the deal" but agreed to credit Savage's account with 15% of plaintiff's fee. Paul Mullaney requested and received a letter written by Savage agreeing to the division, despite Savage's dissatisfaction with his share. Following the disagreement, Savage decided to pay all his own business expenses, rather than the original 50% split, so as to improve his bargaining position with Mullaney.

Savage worked on other transactions while affiliated with plaintiff. These minor deals, the Von Troble, Gerber and Prestcrete transactions, involved Savage's time and energy but Paul Mullaney testified that the proceeds from them never equaled Savage's compensation in any one year and no profits were realized or divided. The Prestcrete transaction was Savage's initial business dealing with defendant Williams.

Savage first met Williams in connection with a proposed club swimming pool financing in 1957 which was never completed. Subsequently, the two men made four investments, in a leasing company, a foundry and two concrete block companies. Savage and Williams, in each instance owned in excess of 50% of the stock of the companies. Mullaney, Wells had knowledge of two of the four investments.

In 1958, Williams enlisted Savage's aid to obtain mortgage financing for the Prestcrete Company. It involved approximately $250,000 and was brought to fruition through a loan from an insurance company. Williams

received 8% of the Prestcrete stock as a fee, gave some shares to other interested parties, and divided the remainder equally between himself, Savage and Mullaney, Wells. The Prestcrete stock certificate was issued in their joint names as tenants in common. When Mullaney, Wells' vice president saw the certificate bearing Savage's name, he became outraged and "fired" Savage immediately. Paul Mullaney told Savage to disregard the man and to deal only with him in the future.

It was also Savage's relationship with Williams which led eventually to the underlying basis of this action, the Blossman transaction. Savage first learned of the undervalued stock of Blossman Hydratane Gas, Inc. in January 1960, through a college friend. Following a financial check, Savage telephoned A. R. Blossman, Sr., the president and chairman of the Blossman Company with the intent of arranging financing for it. Savage admitted at trial that he first called Blossman in his capacity as "plaintiff's representative" and the purpose of the call was to persuade Blossman that he needed plaintiff's services. Savage wrote the following letter, on plaintiff's letterhead:

"February 5, 1960

Dear Mr. Blossman:

I was delighted to have the opportunity to converse with you and become acquainted with you and your rapidly expanding L.P.G. business.

Mullaney, Wells & Company, Inc. of Chicago, Illinois are investment bankers of almost thirty years standing. We are members of the Midwest Stock Exchange and principally engaged in municipal underwriting. In addition, over the years, we have developed a noteworthy group of clients for which we have arranged and negotiated an impressive list of acquisitions, mergers and financings. * * *

As I indicated to you, we have been requested by a private individual to investigate the investment opportunities in the L.P.G. industry. During the past two years, we have invested funds in excess of two million dollars for his account; recently he has become heir to a sizeable fortune and consequently his investment program must be accelerated. We, as a firm, are willing to vouch for our client's reputation, fairness and integrity. * * *

Sincerely,

MULLANEY, WELLS & COMPANY
/s/ Barnard A. Savage, Jr."

The letter contained an additional request for company history, stock and debenture statement and most recent balance sheet and profit and loss statement.

Subsequently, at his own expense, Savage went to Louisiana to see Blossman. Their discussion of efforts to finance the company through a private placement of new bonds was later abandoned. During the ensuing months, communications between Savage and Blossman concerned the latter's desire to obtain financing for a real estate venture and a Caribbean gas deal involving boat hauling of gas. Savage asked Williams to consult on the Caribbean proposal. Blossman came to Chicago in April 1960 to discuss the matter with Savage and Williams. During the course of the meeting, Williams suggested to Blossman that he and Savage might like to purchase the stock interest of the Blossman family in the company if Blossman would entertain the idea favorably. Savage testified that in the fall of 1960, again during the course of negotiations, Savage advised Blossman that the purchase of the latter's stock, if consummated, would be a personal transaction and in no way connected with Mullaney, Wells. Accordingly, all further correspondence was directed to Savage and Williams at one of their jointly-owned companies.

Savage and Williams visited the Blossman Company in September or October, 1960, for further negotiations on the purchase proposal. On November 7, 1960, Blossman and the members of his family executed and delivered an option in favor of Savage and Williams valid up to and including April 1, 1961, on 271,000 shares of the stock held by them in the Blossman Company at $8 per share. The stock was then selling on the over-the-counter market at about $3 per share. The optioned shares represented at that time about 51% of the company's outstanding common stock, but because of a later conversion of debentures into common shares, the shares represented a dilution to a 40% interest at the time the option matured. The 40% interest was exclusive of a substantial stock interest which the Blossman family retained.

Savage and Williams spent considerable time attempting to finance the necessary $2,168,000 required to exercise the Blossman option. In March 1961, Savage and Williams contacted David Milton, chairman of the Equity Corporation, a holding company owning several corporations, including Bell Intercontinental Corporation and Intex Oil Company. After subsequent negotiations between the parties, Milton indicated that Bell Intercontinental would guarantee a bank loan sufficient to exercise the option. A letter commitment from the Harris Trust & Savings Bank for the requisite $2,168,000 was obtained, and Savage and Williams advised the Blossman family that they would exercise the option.

As the April 1 deadline approached, the Blossmans objected to selling the stock unless Savage provided the company with additional capital or long term financing needed for expansion and discussed earlier with Savage and Williams. Blossman testified that Savage was to make available three to five million dollars to expand the company and that the

option was given on such a basis. On March 28, 1961, Blossman's attorney sent a telegram to Savage objecting to the exercise of the option unless the agreed financing was provided.

At this juncture, Glen Ellyn Corporation was utilized. Savage testified that Glen Ellyn was created because "we needed a corporate vehicle for financing." Glen Ellyn already existed as a "shell" corporation which had been organized earlier by Savage and Williams. In late March 1961, Savage and Williams assigned the Blossman option to Glen Ellyn. In exchange for the option which it received, and capital cash contributions totaling $1,200, Glen Ellyn issued 100 shares of common stock, Savage and Williams each receiving 40 shares representing 40% of Glen Ellyn's outstanding stock. Glen Ellyn's remaining 20 shares were distributed to three other men in exchange for promotional services and securing financing. Savage became Glen Ellyn's president and Williams its vice president, and they both were elected to its three-man board of directors along with their attorney.

On March 28, 1961, Mullaney, Wells' vice president received a telephone call from an investment banker friend in New Orleans. The banker had handled some of the Blossman Company's financial matters and sat as one of the directors of the company. He inquired as to the intentions of Mullaney, Wells regarding the Blossman Company due to the option secured by Savage and Williams. Mullaney, Wells' vice president, knowing nothing about the option, asked his friend to have Mr. Blossman contact him immediately.

Later that day, he received a telephone call from Blossman and learned the details of the option, although incorrectly, as to price, percentage of controlling interest and expiration date. He also learned that the Blossman Company would reorganize in an effort to thwart the optionees and that Mullaney, Wells' name was not on the option. Blossman agreed to mail a copy of the option to Mullaney, Wells, which he never did.

This information was related to plaintiff's president, Paul Mullaney, who wanted to fire Savage immediately, whereas the vice president wanted to wait until he received the option. Later that same day, the vice president confronted Savage, demanding an explanation but wanted to wait until the following day. After closing, Savage cleaned out his desk, took his personal files, made arrangements with the office personnel and left a letter of termination on Paul Mullaney's desk. Savage testified he took only his personal files with him upon his departure, whereas plaintiff claimed he took all the files he was working on at the time.

On April 5, 1961, the option on the Blossman stock was exercised by Savage and Williams acting for Glen Ellyn. In order to effect the purchase, the Harris Trust & Savings Bank agreed to loan, directly to Glen

Ellyn, the required $2,168,000 for 190 days under an intricate arrangement involving puts and calls, whereby Bell Intercontinental guaranteed the Harris Bank against loss without recourse to Glen Ellyn. Testimony of the vice president of the Harris Bank who handled the transaction, established that the Blossman shares had no collateral value whatever, which necessitated the guarantee of Bell Intercontinental and the elaborate put-call arrangement.

When Glen Ellyn purchased the Blossman stock for $2,168,000, it immediately stated the fair market value of the stock on its books as $3,068,000 or $900,000 more than the purchase price.

As another step in their efforts to build a gas empire, Savage and Williams contacted Blue Flame Gas and Petroleum Securities Corporations. The defendants were able to successfully solicit the companies' shareholders for options on their stock without having to give substantial consideration. Accordingly, between April 5 and July 15, 1961, they secured options from some 2,000 shareholders on 96% of the stock of the two companies.

Savage and Williams then sought to finance these new options as well as redeem the note given the Harris Bank on the Blossman stock. Savage and Williams planned to transfer the Blue Flame Gas and Petroleum Securities options to Glen Ellyn when Bell Intercontinental agreed to provide the guarantee to the Harris Bank for the financing necessary to exercise the options and agreed to extend the time of its guarantee to the Harris Bank on the original $2,168,000 loan that had been used to exercise the Blossman stock option.

On August 10, 1961, a new company, American Hydratane, which was to be the nucleus of the gas empire, was formed for the purpose of receiving the assets of Glen Ellyn and the Blue Flame Gas and Petroleum Securities Corporations. This arrangement also anticipated a merger with Intex Oil, an American Stock Exchange company 54% owned by Bell Intercontinental. Accordingly, Glen Ellyn transferred its assets to American Hydratane, which included the Blossman shares pledged to the Harris Bank, and the options on Blue Flame Gas and Petroleum Securities, in return for 287,445 shares of American Hydratane stock. American Hydratane then disbursed 173,000 shares of its stock and $1,400,000 in cash, borrowed from the Harris Bank, to the Blue Flame Gas and Petroleum Securities Companies for their assets. In turn, the two companies were liquidated with the stock and cash being distributed to the shareholders.

Shortly after the assets of Blue Flame Gas and Petroleum Securities were transferred into American Hydratane, it became apparent that the merger of the Intex Oil Company with American Hydratane could not be effected on the terms originally proposed. Thereafter, Bell Intercontinental refused to renew the guarantee of the $2,168,000 loan at

the Harris Bank, and on October 17, 1962, the Blossman stock was accordingly "put" to Bell Intercontinental and thereby forfeited by American Hydratane.

Bell Intercontinental was still the guarantor of the $1,400,000 unsecured loan at the Harris Bank that had been used to pay the shareholders of Blue Flame Gas and Petroleum Securities who had taken cash instead of shares in American Hydratane, and it threatened to bankrupt American Hydratane. Before any such threat could be realized, however, Glen Ellyn, in August of 1963 sold its 287,445 shares of American Hydratane stock to Tenneco for $800,000. As part of the sale, Tenneco paid off the loan guaranteed by Bell Intercontinental to the Harris Bank in the amount of $1,400,000. At the time of the sale of Glen Ellyn's American Hydratane stock to Tenneco, American Hydratane owned just the assets of the former Blue Flame Gas and Petroleum Securities Companies and had no interest whatsoever in the Blossman Company, the stock having been previously forfeited to Bell Intercontinental at a loss. There was conflicting evidence presented at trial as to the amount of the loss. American Hydratane's president estimated the loss at about one million dollars whereas Savage estimated the loss at $200,000.

Plaintiff brought the instant action while negotiations were pending between Glen Ellyn and Tenneco. At the time of Savage's resignation, plaintiff's vice president was still awaiting receipt of the Blossman option contract. When he didn't receive it, he telephoned his friend on the Blossman Company's board of directors who informed him there was no longer anything to be worried about. Plaintiff's vice president consulted with Mullaney, Wells' attorney who informed him that nothing could be done about the matter since there was no evidence. In 1963, plaintiff employed an attorney in another matter in connection with which he discovered the Blossman option had been exercised. Believing that a substantial profit could possibly be realized on the Blossman stock, Mullaney, Wells filed suit against Savage, Williams, Glen Ellyn and American Hydratane.

The shareholders of Glen Ellyn, including Savage and Williams, were forced by the pendency of this suit to deposit one-half the proceeds of the sale of Glen Ellyn's American Hydratane stock to Tenneco, or $400,000, with the Harris Bank to abide the outcome of the case. This permitted the sale transaction to be completed in conformity with the requirement of Tenneco that American Hydratane be dropped as a party defendant.

Both the master's report and the hearings held in the trial court on defendants' objections to the master's report considered substantially the same evidence. Initially, the master rejected Savage's contentions that, under his employment contract he was to handle "private placement" of securities and that the Blossman transaction was not a private placement.

The master thus read Savage's duties under his contract as encompassing a broad variety of corporate securities transactions, which included the instant transaction, so that his failure to convey this opportunity to the plaintiff constituted a violation of his fiduciary duty to the plaintiff.

Similarly, the master concluded that Williams was equally liable based upon his knowledge that Savage was breaching his duties to Mullaney, Wells. The master concluded that it was Williams' duty to make inquiry of Mullaney, Wells as to whether it had any such interest in the Blossman stock transaction. Based upon Williams' knowledge and lack of inquiry, the master found him liable because he and Savage were partners in the Blossman transaction and therefore jointly and severally liable for each other's wrongful acts performed in the ordinary course of their business.

The master also found multiple grounds for Glen Ellyn's liability. Its liability was primarily based on Savage's breach of duty to Mullaney, Wells while acting as its corporate officer, under the rule that a corporation is liable for the wrongful acts of its officers when done in the ordinary course of its business. Glen Ellyn's liability was also premised on its reaping of profits from the Blossman transaction without any payment of consideration, and its failure to be a bona fide purchaser of the Blossman stock.

Voluminous objections by all three defendants were filed attacking the master's report. They were argued orally over a period of several days and taken under advisement. On February 1, 1973, the master issued and filed his ruling on defendants' objections, sustaining them in part and amending the record, but retaining the essential findings and ultimate disposition.

Pursuant to the chancellor's order of March 2, 1973, defendants' objections were allowed to stand as exceptions to the master's report. Following Glen Ellyn's filing of a motion for a trial *de novo*, the trial court advised the parties that it would issue its ruling on the motion and the exceptions on July 30, 1974. The trial court sustained the exceptions to the master's report, held it for naught and ordered a new trial. It found that Savage was treated as a "stepchild" of Mullaney, Wells within the office, that the Blossman transaction was no different from the other transactions Savage had worked on in plaintiff's office and that, in any event, plaintiff encouraged its employees to trade on their own account to increase their own incomes.

As stated above, the appellate court remanded the case, ordering the trial court to enter judgment. A final decree was entered by the chancellor on January 12, 1976, affirming the earlier decree's sustaining of all the exceptions to the master's report and dismissing plaintiff's case for want of equity, finding that the "equities of the case lie with the defendants and not with the plaintiff on the issues raised."

In order to determine whether the chancellor's decree dismissing plaintiff's action was proper, it is necessary to consider both what the evidence was required to show for the plaintiff to be entitled to relief and the standards to be employed by the master in making his findings, the chancellor in acting on the master's findings, and a reviewing court considering the correctness of a chancellor's decree entered on a master's report.

A constructive trust is an equitable remedy which will be imposed upon proceeds of a breach of fiduciary duty. *Samuel v. Northern Trust Co.* (1975), 34 Ill. App. 3d 500, 340 N.E.2d 162.

To obtain such a remedy, a plaintiff has the burden of proving not only that a fiduciary relationship existed between plaintiff and defendant, but also that there was an abuse of that relationship (*Jones v. Washington* (1952), 412 Ill. 436, 107 N.E.2d 672; *Kerrigan v. Unity Savings Association* (1973), 11 Ill. App. 3d 766, 297 N.E.2d 699). Fiduciary duties are found by equity in a variety of relationships, including employer-employee and principal-agent. 5 Scott on Trusts §504 (3d ed. 1967).

■■ A further condition to obtaining the remedy of a constructive trust is that the proceeds of the breach of fiduciary duty upon which the plaintiff bases the action must at the time of the action exist as an identifiable fund traceable to that breach, such that it can become the *res* of the proposed trust. *People ex rel. Nelson v. Bates* (1933), 351 Ill. 439, 184 N.E. 597; *In re Estate of Franke* (1970), 124 Ill. App. 2d 24, 259 N.E.2d 841.

■■ A master in chancery entering findings upon evidence in such a case is required to consider that the burden of proof in establishing not only the existence of a fiduciary relationship but also that the scope of such a relationship extended to the conduct complained of is on the plaintiff. (*Maley v. Burns* (1955), 6 Ill. 2d 11, 126 N.E.2d 695; *Ziarko v. Ziarko* (1974), 22 Ill. App. 3d 520, 318 N.E.2d 9.) Moreover, such a showing must be made by clear and convincing evidence. *Jones v. Washington; Stein v. Stein* (1947), 398 Ill. 397, 75 N.E.2d 869.

■■ The findings of a master are purely advisory and in no way binding upon the chancellor. (*Krieg v. Felgner* (1948), 400 Ill. 113, 79 N.E.2d 60.) Where findings of fact alone are in issue and depend on conflicts of testimony, because the master had the opportunity to observe the demeanor of witnesses, his findings should be given due weight (*Feltinton v. Rudnik* (1949), 337 Ill. App. 286, 85 N.E.2d 858), but where findings relate to facts which the chancellor, by virtue of the master's report, may judge as well as the master, a master's findings may be discarded whenever they are clearly contrary to the probative weight of the evidence (*Buchan v. Buchan* (1916), 201 Ill. App. 349).

The most recent thorough analysis by an Illinois court of the weight to be given a chancellor's decree by a reviewing court concluded that, where the chancellor's decree upholds the findings of a master, it should

not be disturbed unless contrary to the manifest weight of the evidence, but where the chancellor's decree is contrary to the findings of a master, the reviewing court's position to consider the evidence is as good as the chancellor's and it is free to make an independent assessment of the evidence (*Uksas v. Zelensky* (1961), 21 Ill. 2d 303, 172 N.E.2d 359). Nevertheless, the decisions of a lower court are presumed on appeal to be correct and will not be reversed unless error is shown by the appellant or plainly appears in the record of the case. *Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237.

With these principles in mind, it is possible to focus on particular master's findings and exceptions, and to assess their correctness. Because the liability of the other defendants is dependent under the terms of the master's findings on Savage's liability, the threshold issue is whether there was clear and convincing evidence that Savage was in a fiduciary relationship with Mullaney, Wells which encompassed the Blossman transaction. If so, it must also be determined whether there were any proceeds traceable to that transaction upon which a trust could be imposed. Only if both of these issues were resolved affirmatively would the liability of Williams and Glen Ellyn merit consideration.

■■ ■ There can be no doubt that, in equity, there existed a fiduciary relationship between Savage and Mullaney, Wells, because equity will find fiduciary duties wherever one party acts on behalf of another (*Jones v. Robley*), and Savage's contract with the plaintiff clearly called for him to perform certain tasks on behalf of Mullaney, Wells. The question is whether the scope of the fiduciary duty arising from this relationship extended to the Blossman transaction. The scope of such a fiduciary duty is not necessarily confined to the contractual duties included in the contract between the parties (5 Scott on Trusts §504 (3d ed. 1967)), nor does it depend for its existence on the precise nature of the relationship between the parties as principal and agent or employer and employee (5 Scott on Trusts §504 (3d ed. 1967)).

The proper measure of the scope of a fiduciary duty is whether a matter is among those touched on in the relationship between the parties (5 Scott on Trusts §504 (3d ed. 1967); *Fox v. Simons* (1911), 251 Ill. 316, 96 N.E. 233; *Shinpaugh v. Midwest Life Insurance Co.* (1961), 32 Ill. App. 2d 207, 177 N.E.2d 426).

■■ Abuse of a fiduciary relationship may be demonstrated by showing that the plaintiff, by virtue of that relationship, reasonably expected to receive the benefits which the defendant kept for himself (*Jones v. Washington*), or that the defendant, in reaping this benefit, unfairly took advantage of the plaintiff's resources (*Funderburg v. Shappert* (1961), 23 Ill. 2d 220, 177 N.E.2d 845).

The master's findings in this case included:

"That it was Savage's duty to solicit, promote and negotiate, as

plaintiff's agent, all types of security transactions involving corporate securities in the industrial field; that the Blossman opportunity and transaction involved corporate securities in the industrial field and it was Savage's duty under the contract to solicit, promote and negotiate that opportunity and transaction for and on behalf of the plaintiff; that Savage breached his contractual duties to plaintiff by failing and neglecting to solicit, promote and negotiate the Blossman opportunity for and on behalf of the plaintiff company and by soliciting, promoting and negotiating the Blossman opportunity and transaction for the benefit of himself, Williams and the Glen Ellyn Corporation."

In other words, the master found that Savage's conduct was a breach of his contractual duties. This is because the master found that in his contract, set forth above:

"From all the evidence presented as to the definition of private placement, the Master states that the usual, ordinary and accepted definition of private placement is a sale or distribution of assets to private firms or individuals, rather than to the public at large, and can involve securities already outstanding (secondary offering), and the issuer need not be a party to the transaction and a purchaser need not be an institutional investment."

Among the numerous, highly specific objections to the master's report filed by the defendants, many were directed to these findings and the evidence underlying them. These objections may be stated generally as follows:

(1) Savage was not an employee of Mullaney, Wells, but rather an independent contractor whose contractual duties were only those provided in his contract.

(2) The Blossman transaction did not come within the terms of that contract and there was no basis for Savage's fiduciary duties to the plaintiff to extend to such a transaction.

In considering the relative merits of these findings and objections, it is impossible to overlook the contrast between the two findings of the master. The first states that Savage's duties extended to virtually all conceivable securities transactions while the second focuses on the precise meaning of a term in Savage's contract describing his duties. It is apparent that, if the former finding were correct, the latter would be superfluous.

The validity of the first finding depends on whether the contract between Savage and Mullaney, Wells, properly interpreted, amounted either to a contract of employment or a contract making Savage a general agent for all forms of securities transactions. Obviously, the express terms of Savage's written contract do not in themselves support such a conclusion. The possibility that this contract was orally amended does

exist and could properly have been considered by the master (*Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 339 N.E.2d 529); however, no evidence was presented in any way contradicting the terms of this written contract regarding compensation of Savage. Thus, although there was considerable evidence, some of it conflicting, that Savage had been in some way associated with a variety of transactions, and that Mullaney, Wells engaged in a variety of transactions, there was no evidence that Savage's involvement in any but the types of transactions specified in his contract was regarded by Mullaney, Wells as compensable.

■■ Obligations under contracts are presumed to be mutual and if a contract is vague, it will be given if possible a construction favoring mutuality of obligations (*Camp v. Hollis* (1947), 332 Ill. App. 60, 74 N.E.2d 31). Accordingly, if the portion of the present contract describing Savage's duties is vague, its meaning can be established by referring to the portion prescribing the conditions for his compensation, which makes it clear that Savage will be compensated only by sharing in fees. Therefore, it must be presumed that only work which generated fees was required of Savage.

Because this presumption was not rebutted, the contrary finding by the master must be rejected.

The master's second mentioned finding, the meaning of the term "private placement," is, according to his report, "based on all the evidence presented," and described the nature of what is "placed" in such transactions. However, the meaning of a term in a contract must be determined first with reference to the contract itself, and only if this proves ineffective may other evidence be resorted to. Viewed in this light, it readily becomes apparent that the major defect of the master's finding as to this term is that it is irrelevant to the issue of whether the Blossman transaction was within the scope of Savage's contract because the crucial consideration is not what is transferred, but rather what parties are involved.

It is sufficient for our purpose to note simply that a private placement entails a transfer of securities or other such paper. Savage's contract provided that he would be compensated from departmental revenues, which in the case of private placements would consist of placement fees. In a three-party transaction, such fees would be charged by Mullaney, Wells for Savage's service in bringing the two parties together. However, in a two-party transaction, where the securities would be placed with Mullaney, Wells, no such fees would be generated unless Mullaney, Wells charged a separate fee for finding itself, an unlikely though not impossible practice. Accordingly, under Savage's contract it must be presumed that his duties were confined to arranging three-party transactions.

Parol evidence does not rebut this presumption. On the contrary, it strengthens it. In the two-party Arlington Heights Bank transaction, although Savage participated, he was not compensated. Moreover despite considerable testimony regarding this transaction, there was no evidence that Mullaney, Wells charged any placement fee for such transactions.

Therefore, it must be concluded that, Savage could not obtain compensation for a two-party transaction, so such transactions were beyond the scope of his contract.

Moreover, the finding that the term private placement included transactions like the Blossman transaction was clearly erroneous under the testimony at trial. The parties agreed that the Arlington Heights Bank transaction and the Blossman transaction were identical in nature. Savage testified that it was his understanding that such transactions were not private placements, and Paul Mullaney testified that he did not regard the Arlington Heights Bank transaction as a private placement. Because a contract is to be construed in keeping with the intent of the parties (*Schek v. Chicago Transit Authority* (1969), 42 Ill. 2d 362, 247 N.E.2d 886), and both parties to the contract agreed it was not their intention to include transactions of this kind under the heading "private placement," the master's finding to the contrary is clearly erroneous.

Accordingly, Savage's contractual duties did not extend to the Blossman type of transaction.

However, because fiduciary duties may in equity extend beyond the scope of legal contractual duties, it is necessary to consider whether equitable aspects of the relationship between Savage and the plaintiff may have given rise to a fiduciary duty regarding this transaction.

The first issue is whether the plaintiff was dependent on Savage to provide it with the type of business here in question, notwithstanding the fact that Savage's contract did not call for him to perform such a service.

Such dependence may be shown by evidence that Mullaney, Wells would have wanted the Blossman opportunity for itself and that it relied on Savage to bring such opportunities to it.

Evidence tending to show that Mullaney, Wells would have wanted the Blossman opportunity consisted primarily of the facts that Mullaney, Wells had entered into comparable transactions on three occasions, and that it had manifested an interest in broadening its range of activity by hiring Savage to explore corporate securities possibilities. The evidence also showed, however, that purchases of stock were a rare activity for Mullaney, Wells, that its largest prior purchases had involved only $400,000, and that it permitted and even encouraged its employees to trade in stock for their own benefit. Also, as discussed above, Savage's contract did not provide for him to find stock for purchase by Mullaney,

Wells, so the hiring of Savage cannot serve as evidence of an intention to expand into that particular field.

Accordingly, the evidence failed to show that Mullaney, Wells contemplated any major forays into the field of stock trading. Because of the $2 million size of the Blossman opportunity, it is not clear that Mullaney, Wells would have desired to make such a major digression from its normal sphere of activity.

As to reliance by Mullaney, Wells on Savage to alert it to such opportunities as the Blossman stock option, no such reliance can be demonstrated under the written contract between Mullaney, Wells and Savage.

It must be concluded that Mullaney, Wells did not expect to be provided by its employees with stock purchase opportunities.

Another way in which a defendant's conduct may be shown to constitute a breach of fiduciary duty is by evidence that this conduct involved unfair use of the plaintiff's resources.

In the present case the evidence was that Savage first learned of the Blossman·Company's possible needs through a personal friend, that he approached that company as a representative of Mullaney, Wells and discussed with it possible transactions of a kind Mullaney, Wells could perform, then, only after finding that no such transactions were desired and that a stock purchase was preferred, did Savage begin to act on his own. During this time he occupied space provided by the plaintiff and used its telephones and stationery, but he paid his own general expenses. Also, during this time he was working on other business of the sort for which the plaintiff had engaged his services.

Because the only compensation Savage received from the plaintiff was a draw from the proceeds his own efforts generated, it cannot be said that this conduct amounted to a significant abuse of his relationship with Mullaney, Wells, such as would entitle Mullaney, Wells to the remedy of a constructive trust. See *Peters v. Meyers* (1951), 408 Ill. 253, 96 N.E.2d 493.

Accordingly, the evidence failed to establish that Savage's conduct constituted a breach of his fiduciary duties to Mullaney, Wells, and absent a breach of fiduciary duties, there is no equitable reason for a constructive trust to be imposed.

Moreover, the evidence establishes that there was no identifiable *res* upon which to impose a constructive trust.

The facts stipulated by Mullaney, Wells, on appeal reveal that the following transactions occurred regarding the Blossman stock:

(1) November 7, 1960, Savage and Williams obtain an option to buy the Blossman stock. No consideration was given for the option.

(2) Savage and Williams transfer the option plus $1,200 in cash to Glen Ellyn in return for 80% of its stock.

(3) April 1, 1961, Glen Ellyn exercises the Blossman option, acquiring the stock subject to a loan of over $2 million with Bell Intercontinental guaranteeing its payment.

(4) Glen Ellyn acquires options to buy Blue Flame Gas and Petroleum Securities stock, hereafter referred to as BFP stock.

(5) Savage and Williams from American HYDRATANE.

(6) August 10, 1961, Glen Ellyn transfers the Blossman stock, and its option to buy BFP stock, to American HYDRATANE in return for a block of American HYDRATANE stock.

(7) August 15, 1961, American Hydratane purchases BFP stock for over $1.3 million plus some of its stock. The purchase was not an exercise of its previously existing option. The cash was acquired under a loan with the BFP stock as security and Bell guaranteeing payment.

(8) June 1962, American Hydratane defaults on the loan for the Blossman stock and that stock is transferred to Bell pursuant to the loan security arrangement.

(9) August 9, 1963, Glen Ellyn agrees to sell all of its American Hydratane stock, representing a 62% interest, to Tenneco for a price of $800,000.

From these facts it may be inferred that 62% of the assets of American Hydratane was worth $800,000 in 1963. The plaintiff maintains that this value represents the profit realized by the defendants from the Blossman stock. However, American Hydratane did not own that stock in 1963, having lost it to Bell in the previous year.

The plaintiff argues, however, that the $800,000 value of the defendants' share of American Hydratane must be traceable to the Blossman stock because the defendants acquired that share solely in return for transferring the Blossman stock to American Hydratane. Thus, they argue that the defendants gained $800,000 at the expense of American Hydratane.

This argument as to stock value, however, ignores the situation that existed at the time the crucial transaction occurred. When the defendants acquired their American Hydratane stock, that corporation had, according to the plaintiff, no assets other than the Blossman stock. Regardless of the value of the Blossman stock while American Hydratane held it, all of its value was lost when that stock was forfeited to Bell. Accordingly, the Blossman stock cannot have contributed anything to the value of American Hydratane's own stock, so there was no net gain to American Hydratane stock due to the Blossman stock.

The 1963 value of American Hydratane stock was due exclusively to its other activities, such as its acquisition of the BFP stock.

Plaintiff's argument as to the defendants' own gain is that the defendants would not have shared in these profits had they not obtained

American Hydratane stock in return for the Blossman stock. This argument overlooks the fact that, until American Hydratane acquired the Blossman stock, it had no assets, so its stock was without value. Since Savage and Williams founded American Hydratane and controlled its board, they could have acquired its stock without offering the Blossman stock in exchange. Then, by pursuing the same course of action with respect to BFP stock, they would have reaped the same results.

Perhaps the best way to demonstrate the weakness of plaintiff's position is to assume that the Blossman stock was undervalued. Under this view, defendants gave American Hydratane stock worth more than the loan it secured, thus providing it with net assets in return for stock in American Hydratane. The value of that stock in excess of the loan it secured, however, was in no way used by American Hydratane, not even as security for any further loans. Subsequently, all of the value of that stock was forfeited when the loan it secured was defaulted on. As a result, the stock of American Hydratane received by the defendants was valueless before they obtained it and, after loss of the Blossman stock, none of its value was traceable to its having owned that stock.

The conclusion that must be drawn is that none of the defendants' funds are traceable to proceeds from the Blossman transaction.

■■ The foregoing has shown that the evidence in this case fails to establish that Savage's conduct in the Blossman transaction was in violation of the fiduciary duties arising from his relationship with Mullaney, Wells, and establishes that there were no proceeds from that transaction which could be identified in the possession of any of the defendants. Thus, the plaintiff has failed to establish an equitable basis for the relief sought.

Because Savage's conduct did not violate any fiduciary duty, there is likewise no basis for liability of Williams or Glen Ellyn, whose participation was solely through Savage.

In view of our finding in favor of the defendants on the underlying action for imposing a constructive trust, the defendants have suffered no prejudice from the participation of the law firm of Winston & Strawn on behalf of the plaintiff. Accordingly, there is no cause to disturb the action of the chancellor in denying defendants' motion to bar that firm's participation.

For these reasons, the order of the circuit court of Cook County is affirmed.

Affirmed.

McGLOON and O'CONNOR, JJ., concur.