(No. 35018.—

J. L. MORTELL, Appellant, *vs.* LOUIS E. BECKMAN *et al.,*
Appellees.

*Opinion filed March 20, 1959.*

BISHOPP, BURDETT, FALASZ & DOHERTY, of Chicago, and GRAY, McINTIRE, PETERSEN & ACKMAN, of Kankakee, (JOHN H. BISHOP, DONALD GRAY, and ROBERT J. BURDETT, of counsel,) for appellant.

WERNER W. SCHROEDER, and JAMES E. HASTINGS, both of Chicago, and EDWIN W. SALE, of Kankakee, for appellees.

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

Plaintiff, J. L. Mortell, appeals from a decree of the circuit court of Kankakee County which dismissed for want of equity his complaint to declare a constructive trust in certain real property purchased by defendant Louis E. Beckman. Joined as parties defendant were Elizabeth Beckman, his spouse, and Louise E. Hickey, with whom Beckman had made and partially performed a contract to purchase the land in question. A freehold is involved and the single issue for determination is whether defendant was plaintiff's agent for the purchase of such land.

Undisputed facts show that plaintiff is an officer of a manufacturing company and a successful business man. Defendant, likewise successful and prominent in civic affairs, is a realtor who has developed several subdivisions. Both have other interests and both are members of the Kankakee Country Club, which owns a 76-acre tract improved with a 9-hole golf course, but the two men had experienced no business dealings together prior to the incidents out of which this litigation arose. Defendant's home, which he purchased in 1952, adjoins the club land on the northwest while the land featured in this suit, an undeveloped 11½-acre tract referred to as the Hickey property, adjoins the property of both the club and defendant· on. the north.

When defendant purchased his home in 1952 he sought also to buy the Hickey property, his stated purpose being to control its development and thus protect his home, but he was then able to purchase only the 188 feet nearest his home because the Hickey family did not wish to sell. He did, however, obtain an oral promise that he would be notified of any offers and given first opportunity to meet them.

During the summer of 1954 there was a desire on the part of some club members to expand the club by constructing a swimming pool and enlarging the golf course to 18 holes. Other members were opposed due to the poor financial condition of the club. Plaintiff, who was a director and club treasurer, was one of the principal advocates of expansion and it was his testimony that he made investigation and drew out a design for an 18-hole golf course which contemplated the use of $8\frac{1}{4}$ acres of the Hickey tract. In late September or early October, five or six influential members of the club, including Arthur Beckman, defendant's cousin, met at the home of plaintiff's brother to discuss a slate of club officers which would be favorable to expansion. The matter of utilizing and purchasing the Hickey land was discussed and met with approval, but those present agreed the purchase could not be made without the consent of the entire membership. Plaintiff then proposed that he would buy the property without obligation to the club, and that he would resell to the club at his cost if, within three years, the club was agreeable and financially able to make the purchase. It does not appear, however, that any binding agreement was ever entered into between the club and plaintiff. This plan likewise was approved by the meeting and shortly thereafter plaintiff engaged Blaine Johnson, a real-estate broker and a club member, to negotiate with the Hickeys for the purchase of their land. Defendant's cousin informed him of the meeting, whereupon he went to the Hickey residence and received assurance that the promise

to give him a first refusal of the property would be kept. In this regard there is no question but what Blaine Johnson contacted the Hickeys on several occasions in October, or that his final offer was $35,000, and it appears that a son of Louise E. Hickey kept defendant informed of the negotiations.

Defendant and plaintiff met and conversed on several occasions during October and early November, but what resulted from those meetings is a matter of dispute. In any event defendant entered into a contract to purchase the property for $35,000 on December 5, 1954, and his refusal to meet plaintiff's subsequent demands for a conveyance of 8¼ acres led to this litigation. It is defendant's position that he purchased the property in his own right, not as agent for plaintiff, and that, at best, he had but an oral contract to convey to plaintiff which fails because of the Statute of Frauds and because there was no meeting of the minds as to essential terms. This was the finding of the chancellor and the scope of plaintiff's appeal embraces only the theory that defendant purchased 8¼ acres of the land as his agent.

Equity will raise a trust by construction in two instances. First, where there is a fiduciary or confidential relationship and a subsequent abuse of such relation; second, where actual fraud makes it necessary to protect the rights of the defrauded party and promote the interests of society. (*Kapraun* v. *Kapraun,* 12 Ill.2d 348; *Carroll* v. *Caldwell,* 12 Ill.2d 487; *Kochorimbus* v. *Maggos,* 323 Ill. 510.) Plaintiff in this case predicates his claim to such a trust on the first ground, contending that defendant occupied the fiduciary relation of agent for the purchase of 8¼ acres of the property in question and that he abused such relation by purchasing and retaining the property for himself. It is the settled law of this jurisdiction, to which both parties agree, that where one occupies the fiduciary relation of agent for another, and thereby gains something for him-

self which in equity and good conscience he should not be permitted to keep, equity will raise a constructive trust and compel him either to turn it over to the equitable owner, or to otherwise execute the trust as the court may direct. (*Black v. Gray*, 411 Ill. 503; *Doner v. Phoenix Joint Stock Land Bank*, 381 Ill. 106.) At the same time, however, it is equally well established that where one party agrees to sell to another after making a purchase for himself, no basis for a fiduciary relationship exists, and if the agreement to resell is oral, it cannot be enforced. (*Stephenson v. Thompson*, 13 Ill. 186; *Perry v. McHenry*, 13 Ill. 227; *Walter v. Klock*, 55 Ill. 362; see also *Davis v. Stambaugh*, 163 Ill. 557; 20 I.L.P. Statute of Frauds, sec. 53.) Dispute arises in this case, however, over the factual question of whether a relationship of principal and agent ever came into existence, and plaintiff's brief concedes that ultimate determination rests on the credibility of the witnesses.

The focal point of the remaining evidence is a so-called "bank meeting" which occurred either in late October or early November. It is plaintiff's contention that complete agreement was reached at that time, including an accord that defendant was to act as his agent for the acquisition of the 8¼ acres. Defendant denies both that an agency was created, or that complete agreement was reached.

Detailing his actions prior to the bank meeting, defendant testified he encountered Blaine Johnson, and accepted a ride in his car as he left the Hickey residence on the occasion of receiving assurance he would have a first refusal of the Hickey property. At that time he told Johnson of his agreement with the Hickeys, of his intention to purchase the property for himself, and of his hope that something could be worked out through the plaintiff for the benefit of the club. Immediately thereafter he made an appointment with plaintiff and conveyed the same information. While the number of meetings and conversations held prior to the bank meeting is not agreed upon, the testimony of

both parties makes it manifest that they did agree to a plan whereby plaintiff could acquire 8¼ acres for the benefit of the country club while defendant would acquire 3¼ acres nearest his home. There was, however, disagreement as to price, the testimony of both showing that defendant was thinking in terms of a flat proration of the ultimate purchase price on acreage basis, while plaintiff wanted a higher value allocated to defendant's 3¼ acres. Although defendant expressly denied it, plaintiff testified that, on each occasion, defendant sought to persuade him to discharge Johnson and to permit defendant to act as his agent for the purchase of the 8¼ acres. Leaving no doubt that he was pursuing an independent course to purchase the land just prior to the bank meeting, plaintiff testified he refused and "kept his own real estate man," because he could get no commitment from defendant on a proration of the purchase price.

Knowing of the stalemate over price allocation, E. E. Mortell, plaintiff's brother, met with defendant's cousin, Arthur Beckman, to discuss the matter. Arthur was a bank president, as well as a club member, and it was Mortell's belief he could aid in bringing about some agreement on price allocation that would benefit the club. After some discussion between the two men, first the defendant and then the plaintiff were summoned to the bank. In telling of what occurred both plaintiff and his brother testified in substance it was agreed that defendant would buy the property for both parties, that the Hickeys would be offered a price of $35,000 of which plaintiff was to pay $20,000 for 8¼ acres and defendant $15,000 for 3¼ acres, that Blaine Johnson would be discharged by plaintiff, that defendant would step into Johnson's shoes and become plaintiff's agent for the purchase of 8¼ acres, and that defendant would have a first refusal for the purchase of the 8¼ acres in the event the club had not purchased at the end of three years. With regard to Johnson, plaintiff further

testified it was agreed to let him make a final offer of $35,000 to the Hickeys in order "to pacify him a little bit."

Defendant admitted that two things were accomplished at the meeting. First, that he acceded to plaintiff's desires on price allocation as a concession for the benefit of the club and, second, that he agreed to sell plaintiff 8¼ acres for $20,000 if he was able to purchase the entire tract for $35,000. According to him, however, his offer was conditioned upon his being granted an option to repurchase the 8¼ acres at plaintiff's cost plus interest and expenses, in the event the club did not purchase from plaintiff, and no agreement was reached on this point. He further testified plaintiff and his brother were well aware he was going to purchase in his own right and categorically denied that Johnson was discussed at the meeting or that he, the defendant, was either asked or agreed to be the plaintiff's agent. Arthur Beckman corroborated defendant's view that Johnson's name was not mentioned at the meeting and from his entire testimony it appears that all the discussions were conducted with an awareness on the part of all present that defendant was going to purchase the land for himself and resell part of it to plaintiff. According to Arthur the chief preoccupation of the parties, once an allocation of price had been agreed upon, was the disposition of the 8¼ acres in event the club failed to purchase it within three years and it is the purport of his testimony that no specific settlement of this point was made. From all the evidence we agree with the chancellor that disagreement over repurchase spoiled the deal.

Blaine Johnson appeared as a witness for the plaintiff and it is contended his testimony corroborates the claim that defendant, upon the occasion of the bank meeting, replaced him as the plaintiff's agent. According to Johnson, who agreed that he had only one conversation with defendant, he gave defendant a ride in his car late in October, presumably just after the bank meeting, and was told by

defendant of a meeting where prices were discussed and at which "it had been decided that you are to step out of the deal, go in and make a final offer and I am to take over and represent both parties in obtaining that property." Johnson said he saw the plaintiff the next day and then made the Hickeys a final offer of $35,000. Defendant denied such a meeting or conversation and, as previously related, repeated that his only contact with Johnson had been early in October at a time before he had ever discussed the matter with the plaintiff. An unusual aspect of the record is that plaintiff's verified complaint alleged that the meeting of Johnson and defendant had occurred prior to the bank meeting, and plaintiff so testified, but the complaint was amended at the close of the evidence to conform with Johnson's version.

The burden of proving facts from which a fiduciary relation would arise is on the one who attempts to impress a trust upon property, and where such relationship is sought to be established by parol evidence, the proof must be clear, convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion. (*Kolze* v. *Fordtran,* 412 Ill. 461.) The evidence in this record clearly fails to meet such a test, and we are therefore in accord with the chancellor's finding that a fiduciary relationship did not exist. Apart from the testimony of Johnson, a determination of whether or not defendant became the plaintiff's agent rests on a choice of which witnesses were telling the truth as to the agreements reached at the bank meeting. When testimony is contradictory, this court will not substitute its judgment as to the credibility of witnesses for that of the trial court which saw and heard them, and will not disturb the findings unless they are manifestly against the weight of the evidence. (*Wynekoop* v. *Wynekoop,* 407 Ill. 219; *Finney* v. *White,* 389 Ill. 374.) Here there is ample evidence from which the chancellor could conclude that defendant never retreated from his intention of buying the

property in his own right, and that he was not in fact employed as plaintiff's agent. Indeed, plaintiff himself testified that, had Johnson's final offer to the Hickeys been accepted, he would have considered himself the purchaser, inasmuch as no agreement had been reached in event Johnson's offer was accepted. Such testimony is inconsistent with his prior testimony of an agreement to discharge Johnson and employ defendant in his stead. With regard to the final offer made by Johnson, we think it highly implausible that experienced business men would either believe or propose that Johnson would be "pacified" and willing to step out of his contract simply because he was afforded the privilege of making a final offer. Johnson's testimony itself loses much of its force in view of the contradictory pleading and testimony of the plaintiff and, in view of defendant's complete denial, its weight and credibility was a matter for the chancellor. Although plaintiff interprets it to the contrary, the conduct of the parties after the bank meeting lends credence to the finding that neither a fiduciary relation nor a final agreement of any nature came into being at the bank meeting.

The decree of the circuit court of Kankakee County dismissing the complaint for want of equity is affirmed.

*Decree affirmed.*