**In re STOTLER AND CO., Debtor.**

**The OXFORD ORGANISATION, LTD., Plaintiff,**

**v.**

**Ronald R. PETERSON, as Trustee in Bankruptcy of Stotler and Co., Defendant.**

**No. 91 C 1178.**

United States District Court, N.D. Illinois, E.D.

Aug. 19, 1992.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Oxford Organisation, Ltd. ("Oxford") seeks a constructive trust over certain funds held by defendant Ronald R. Peterson, trustee in bankruptcy of Stotler and Co. ("Stotler"). Oxford contends that the commodities futures trading regulations create a fiduciary relationship between Stotler and Oxford justifying a constructive trust. We have before us the parties' cross motions for summary judgment. There are no contested material facts. For the reasons hereinafter explained, we grant Stotler's motion for summary judgment.

### I.

Stotler was the nation's tenth largest futures commodities merchant ("FCM") when it filed for bankruptcy on August 24, 1990. An FCM trades contracts for future delivery of commodities, in accordance with federal regulations. Oxford is an introducing broker ("IB") who had referred to Stotler one of its customers, Commodity Guaranteed Fund Trading/USA Ltd. ("CGF"). IBs, who also must follow federal regulations, operate by matching up futures investors with FCMs.

Per industry practice, IBs are paid by receiving a cut of the commissions that FCMs charge the customer. Stotler and Oxford memorialized their relationship, including the commission reimbursement mechanism, in the "Clearing Agreement" dated April 19, 1990. Paragraph 3(f) of that document provided that Stotler would "[r]emit to the IB [Oxford] ... commissions paid to Stotler [to] which the IB is entitled...."

By law, the FCM is required to keep the monies from all its customers in a segregated account, separated from the rest of the FCM's funds. 17 C.F.R. § 1.20 (1991). The FCM must separately account for each customer's monies within the segregated account. *Id.* The FCM withdraws its commissions from the segregated account and may pay its IBs out of these funds. Although Oxford introduced only one customer to Stotler, it earned $154,068 in commissions.

Stotler did not pay Oxford that sum, or any portion thereof. Oxford seeks a constructive trust to recover these commissions. Peterson, the trustee, has already begun to distribute the estate's funds to the customers who had accounts at Stotler on the petition date. There are over $96 million in claims against Stotler, including $3.5 million in remaining customer claims and $4 million in IB commission claims.

### II.

In a world of infinite judicial fiat, all who justly deserved relief would receive their full measure of compensation. In such a happy world, bankruptcy law would be superfluous. In our world, however, the courts cannot create the money lost or squandered by the debtor. The bankruptcy code, therefore, seeks to distribute the remaining property of an estate as equitably as possible. Under Chapter 7, the situation here, creditors must wait their turn according to the statutory ordering of claims. Secured creditors are paid first, then any unsecured claims with statutory priority, and, finally, the general unsecured claims. *See generally* George M. Treister, *Fundamentals of Bankruptcy Law* §§ 4.03, 6.05 (2d ed. 1988). The property of the estate basically includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1988).

The ordering of priority claims follows 11 U.S.C. § 507 (1988) generally, but, when the debtor is an FCM, 11 U.S.C. § 766 (1988) supplements the priority ordering and gives the customers priority over all other unsecured claims except administrative costs:

Except as provided in subsection (b) of this section, the trustee shall distribute customer property ratably to customers on the basis and to the extent of such

customers' allowed net equity claims, and in priority to all other claims, except claims of a kind specified in section 507(a)(1) of this title that are attributable to the administration of customer property . . . .

11 U.S.C. § 766(h). The Senate Judiciary Committee notes accompanying this statute emphasize that "[a] fundamental purpose of these provisions is to ensure that the property entrusted by customers to their brokers will not be subject to the risks of the broker's business and will be available for disbursement to customers if the broker becomes bankrupt." S.Rep. No. 989, 95th Cong., 2d Sess. (1977) U.S.Code Cong. & Admin.News 1978, p. 5787.

## III.

### A.

Generally speaking, state law defines property rights, provided that any conflicting federal bankruptcy provisions govern instead. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979); *In re Iowa R.R.,* 840 F.2d 535, 536–37 (7th Cir.) (citing *Butner* ), *cert. denied,* 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988). Under Illinois law, "[t]he burden of proving the existence of a constructive trust is on the person seeking to establish it[.]" *Selmaville Community Consol. Sch. Dist. No. 10 v. Salem Elementary Sch. Dist. No. 111,* 96 Ill.App.3d 1062, 1065, 52 Ill.Dec. 224, 227, 421 N.E.2d 1087, 1090 (5th Dist.1981); *see also Mortell v. Beckman,* 16 Ill.2d 209, 212, 157 N.E.2d 63, 67 (1959).

■ Illinois law will only impose a constructive trust as an equitable remedy in cases of actual fraud or breach of a fiduciary duty. *Ray v. Winter,* 67 Ill.2d 296, 303, 10 Ill.Dec. 225, 229, 367 N.E.2d 678, 682 (1977) (citing, *inter alia, Mortell* ); *see also In re White Farm Equip. Co.,* 63 B.R. 800, 807 (Bankr.N.D.Ill.1986). Oxford does not argue fraud. Instead, it maintains that Stotler breached its fiduciary duty to Oxford to pay Oxford's commissions.[1]

■ We note initially that we are unaware of any case law supporting the judicial establishment, absent a specific statutory mandate, of a constructive trust upon funds held by a trustee in bankruptcy. When a trust is established over a bankruptcy trustee's funds, a specific statutory provision permits its use in the particular situation at hand. *See, e.g., Begier v. IRS,* 496 U.S. 53, 67, 110 S.Ct. 2258, 2267, 110 L.Ed.2d 46 (1990) (monies withheld by debtor from his employees to cover federal income, FICA, and excise taxes were not property of the estate, but were held in trust for the United States pursuant to 26 U.S.C. § 7501); *In re California Trade Technical Sch., Inc.,* 923 F.2d 641, 644 (9th Cir.1991) (Higher Education Act of 1965, 20 U.S.C. §§ 1070–1098, establishes trust fund for monies disbursed to schools on behalf of student beneficiaries); *Selby v. Ford Motor Co.,* 590 F.2d 642, 643 (6th Cir.1979) (Michigan Builders Trust Fund Act, Mich. Comp.Laws Ann. § 570.151 (West 1967), creates a trust fund for monies owing to subcontractors and project owner); *In re Milton Poulos, Inc.,* 94 B.R. 648, 650 (Bankr.C.D.Cal.1988) (Perishable Agricultural Commodities Act, 7 U.S.C.

---

1. Other courts have required more than a breach of a fiduciary duty to establish a constructive trust. *See, e.g., In re Black & Geddes, Inc.,* 35 B.R. 830, 836 (Bankr.S.D.N.Y.1984) (court must also balance the equities of the claims of beneficiary and other creditors), *summary judgment granted,* 59 B.R. 873 (Bankr. S.D.N.Y.1986). The Illinois Supreme Court in *Suttles v. Vogel* noted that "[t]he sole duty of the constructive trustee is to transfer title and possession of the wrongfully *acquired* property to the beneficiary." *Suttles,* 126 Ill.2d 186, 193, 127 Ill.Dec. 819, 822, 533 N.E.2d 901, 904 (1988) (citing *Charles Hester Ents., Inc. v. Illinois Founders Ins. Co.,* 114 Ill.2d 278, 293, 102 Ill.

Dec. 306, 313, 499 N.E.2d 1319, 1326 (1986)) (emphasis added); *see also In re Iowa R.R.,* 840 F.2d at 545 ("A constructive trust usually depends on a fraudulent act to *obtain* control of the assets, and the Iowa put its hands on this money legitimately.") (emphasis added). *See generally* 5 Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 462.2 (4th ed. 1987) (constructive trust usually justified to prevent unjust enrichment). In the present case, Stotler acquired possession of the commissions legally and according to the parties' agreement. In any event, we need only consider the existence of a fiduciary duty allegedly owed to Oxford by Stotler.

§ 499e(c), creates trust benefitting sellers of perishable agricultural goods for monies owed to them by distributing company), *aff'd*, 107 B.R. 715 (Bankr.9th Cir.1989), *aff'd. in part, rev'd, in part*, 947 F.2d 1351 (9th Cir.1991).

This may be because a constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code. As the court in *In re Behring International, Inc.*, 61 B.R. 896 (Bankr.N.D.Tex.1986), explained:

> The reluctance of Bankruptcy Courts to impose constructive trusts without a substantial reason to do so stems from the recognition that each unsecured creditor desires to have his particular claim elevated above the others. Imposition of a constructive trust clearly thwarts the policy of ratable distribution and should not be impressed cavalierly.

*Id.* at 902. The Seventh Circuit shares this reluctance. *See Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir.1990) (" 'Furthermore, the grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion.' ") (quoting *Suttles v. Vogel*, 126 Ill.2d at 194, 127 Ill.Dec. at 823, 533 N.E.2d at 905).

### B.

Under Illinois law, proof of a fiduciary or confidential relationship requires a showing that one party has reposed trust and confidence in another who thereby gains influence and superiority over the other. *Ray* [*v. Winter*, 67 Ill.2d at 304,

---

2. *See, e.g., In re Estate of Nelson*, 132 Ill.App.2d 544, 552, 270 N.E.2d 65, 71 (1st Dist.1971) (evidence of fiduciary relationship held insufficient in part because there was no domination of one party by the other).

3. In that case, Amendola and Bayer agreed to pursue a leveraged buy-out of AdCom, Inc. Bayer was the president of AdCom, whose parent company, Quaker Oats Co., also entertained bids for AdCom from an advertising agency ("B & S"). After several months of competition between B & S and Amendola/Bayer, Bayer recommended to Quaker that it accept the offer from B & S. Quaker accepted the bid and Amendola sued Bayer on the grounds that Bayer breached a contract, and, alternatively, a

---

10 Ill.Dec. at 229], 367 N.E.2d at 682. The factors to be considered in determining the existence of a fiduciary or confidential relationship are the degree of kinship of the parties, the disparity in age, health, mental condition, education and business experience between them, and the degree of trust placed in the dominant party.

*Amendola*, 907 F.2d at 763 (citations omitted). To prove the existence of a fiduciary relationship, then, Oxford must show that Stotler held, relative to Oxford, some position of superiority or dominance.[2] Oxford and Stotler would appear equally situated with respect to mental condition, education, business acumen, and the other factors considered in *Amendola*.[3] Accordingly, Oxford's claim of a fiduciary relationship must rely solely on its interpretation of the statutory framework that governs FCMs, IBs, and the futures commodities trading industry.

■ Oxford contends that it may not accept payments directly from customers, but must instead receive its commissions indirectly through the FCM. Oxford cites 17 C.F.R. § 1.57(c) (1991), which provides that

> [a]n introducing broker may not accept any money, securities or property (or extend credit in lieu thereof) to margin, guarantee or secure any trades or contracts of customers or option customers, or any money, securities or property accruing as a result of such trades or contracts: *Provided, however,* That an introducing broker may deposit a check in a qualifying account or forward a check

---

fiduciary relationship. The level of trust Amendola had to place in Bayer would seem greater than the trust Oxford claims to have placed in Stotler. The Seventh Circuit nevertheless found no fiduciary relationship and affirmed summary judgment for Bayer. 907 F.2d at 761.

Procedurally paralleling *Amendola*, a motion to dismiss in this case failed (as, additionally, did Stotler's motion for reconsideration). *See In re Stotler & Co.*, No. 91 C 1178, 1991 WL 158889 (N.D.Ill. Aug. 6, 1991); *In re Stotler & Co.*, No. 91 C 1178, 1991 WL 268051 (Dec. 3, 1991). On summary judgment, stripped of the presumptions in its favor when confronted with a motion to dismiss, it becomes apparent that Oxford—like Amendola—cannot prevail.

drawn by a customer or option customer. . . .

As construed by Oxford, this provision distinguishes between direct and indirect payments between a customer and his IB, allowing only indirect payments. That interpretation does actually jibe with the industry practice; most, if not all, IBs receive their commissions through the FCM, who charges the customer one commission and then splits it with the IB. *See generally* Don L. Horwitz & David J. Gilberg, *Introducing Brokers Under the Commodity Exchange Act: A New Category of Commodity Professionals*, 40 Wash. & Lee L.Rev. 907 (1983). Other federal regulations fill out the remainder of the statutory framework. *See* 17 C.F.R. § 1.20 (requiring the FCM to keep the customer's money in a segregated account and to account for each customer's monies); 17 C.F.R. § 1.23 (allowing the FCM to withdraw customer money "to the extent of its actual interest therein").

Peterson and the Commodity Futures Trading Commission ("CFTC")[4] both dispute Oxford's interpretation of § 1.57(c). Both emphasize that § 1.57(c) does not mention commissions explicitly and there-

fore conclude that the provision does not apply to commissions. According to this reading, the regulation does not ban all direct payments by a customer to an IB, so long as that payment is a commission.[5]

We do not believe that this statutory framework implicitly mandates a fiduciary relationship between the FCM and the IB. Futures commodity trading *is* a highly regulated enterprise. But even granting Oxford its argument that the IB may only be paid indirectly through the FCM, that circumstance in and of itself neither depends on nor necessitates a fiduciary relationship. Significantly, Oxford fails to cite a single analogous situation[6] in which a court found a fiduciary relationship solely (or even partly) because a web of government regulation allowed only one method of remuneration. Moreover, the statutory framework put forth by Oxford does not establish that Stotler has the requisite domination or superiority as to Oxford for there to be a fiduciary relationship.[7] The FCM and IB are free to contract on a variety of remuneration specifics (or even not to contract at all), including timing, amount, and source—as the CFTC points out in its brief, nothing in the regulations

**4.** The CFTC "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 762(b) (1988). The CFTC filed a brief in this case regarding the cross motions for summary judgment.

**5.** Section 1.57(c) says "any money." Read literally, it does not distinguish between proper and improper payments to IBs on the basis of directness of the customer's payment. First, it prohibits an IB from using the money to trade futures, as may an FCM. Then, § 1.57(c) distinguishes on the basis of whether the money originates—"accrues"—from the growth of the customer's account due to successful manipulation by the FCM. It would seem to allow a direct payment from the customer to the IB, as long as the amount of the commission is not tied to the accrual of funds through trading. For example, the IB could charge the customer a percentage fee based on the amount of the customer's *initial* deposit.

This reading of § 1.57(c) would seem to prohibit the IB from receiving a continuous percentage of the customer's profits, even if the commission were channelled through the FCM. That interpretation, however, contravenes the accepted industry practice, which allows withdrawal of customer funds from the segregated

account to pay FCM commissions, an aspect of the remuneration scheme that may or may not be based on 17 C.F.R. § 1.20(c). Oxford's interpretation of § 1.57(c), buttressed by industry practice, is at least as faithful to the murky regulatory language as is the CFTC's. Fortunately, we need not decide whether § 1.57(c) allows direct payment of commissions to IBs from their customers in order to reach the question of whether the statutory framework establishes a fiduciary relationship between the FCM and the IB.

**6.** Indirect payment schemes are not unheard of. Travel agents, for example, do not charge their customers directly, but receive a commission from the airlines. *See, e.g., In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981).

**7.** 7 U.S.C. § 6d (1988) does establish a fiduciary duty between the FCM and the customer. The funds in the segregated account are to be "treated and dealt with as belonging to the customers. . . ." *Id.* Besides the statutory language, a fiduciary relationship between the FCM and the customer arises from the level of trust inherent in allowing another person to control one's funds in a speculative venture. *See also infra* note 11.

prohibits the FCM from paying the IB with non-segregated account funds. CFTC Brief at 9. *See* 17 C.F.R. §§ 1.20(c), 1.23.

The contractual freedom here belies Oxford's claim that it had "no choice but to [trust]" Stotler to pay the commissions. Plaintiff Brief at 8. Oxford's dealings with Stotler were not based on mere trust, but rather upon the Clearing Agreement signed by both parties. As noted *supra,* Stotler agreed to "remit" to Oxford each month the "commissions paid to Stotler [to] which the IB is entitled, for the previous month less adjustments and offsets hereunder." Clearing Agreement ¶ 3(F). Oxford argues vehemently [8] that the fundamental basis of Stotler's obligation to Oxford was not contractual, but rather a result of the statutory framework. Oxford dismisses the Clearing Agreement as "merely a vehicle which Oxford had to employ to obtain its funds." Brief at 8. With this phrase, Oxford implicitly recognizes that a contract's *raison d'etre* is to insure that one can "obtain its funds," through judicial enforcement of the writing if necessary. Had a solvent Stotler simply decided not to pay Oxford, we would call the situation a breach of contract, or a debt. We would then recognize the Clearing Agreement,[9] and not a purported statutorily implied fiduciary relationship,[10] as the basis for the obligation to pay. As do parties in other highly regulated industries, Oxford and Stotler made an agreement and bound each other to it by signing a contract.

**8.** Perhaps a bit too vehemently at times. We suggest that Oxford's counsel peruse the recently issued *Final Report of the Committee on Civility of the Seventh Federal Judicial Circuit.*

**9.** Although the Agreement does make contingency provisions should bankruptcy befall either party, Clearing Agreement ¶ 20(d) ("This agreement ... [s]hall terminate upon adjudication of bankruptcy"), it does not establish an express trust for Oxford's commissions.

**10.** One distinction between a contract and a fiduciary relationship is the possibility of specifying terms. In a fiduciary relationship, such as between an FCM and a customer, the customer wants to bind the FCM to behavior that cannot be precisely spelled out. He wants the FCM to ply his trade the best he can so as to make the most money for the customer. But even with

■ Breach of contract does not alone justify the imposition of a constructive trust. *Amendola,* 907 F.2d at 763; *see also McKey v. Paradise,* 299 U.S. 119, 57 S.Ct. 124, 81 L.Ed. 75 (1936) (denying constructive trust upon monies owed by debtor employer who had agreed to pay into an employee association fund by deducting money from paychecks; the Court noted that the debtor did not accumulate the money, but rather he paid it monthly to the association; the claim was held to be an unsecured debt); *In re Iowa R.R.,* 840 F.2d at 545 (debtor's failure to offset debt with other railroad companies held breach of contract, insufficient for imposition of constructive trust). In short, Oxford has not carried its burden of proving the existence of a constructive trust, and summary judgment must therefore be granted to Stotler.

### C.

■ Assuming, *arguendo,* that we recognized a fiduciary relationship benefitting Oxford, we would still need to decide whether Oxford must trace its commissions in order to avail itself of a constructive trust. The Supreme Court, in *Cunningham v. Brown,* 265 U.S. 1, 11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924), imposed a tracing requirement upon the victims of the original Ponzi scheme. The victims sought a constructive trust to recover from the estate ahead of the general creditors. *Id.* at 7, 44 S.Ct. at 425; *see also Hoffman v. Rauch,* 300 U.S. 255, 257, 57 S.Ct. 446, 447, 81 L.Ed. 629 (1937); *cf. Begier,* 496 U.S. at

an eagle eye on the FCM at all times, one could hardly distinguish when the trader was improperly careless or just innocently unlucky. The FCM would probably need to do significantly worse than his peers to call attention to any possible slacking. The customer can hardly rely on a writing to govern the FCM's performance; in fact, he can only trust the FCM to trade as effectively as possible.

By contrast, the actions expected of Stotler with respect to Oxford can easily be reduced to writing, as they were in the Clearing Agreement. Identifying a violation would only require the financial data Stotler kept in its accounting of the segregated account. Oxford's remedy for Stotler's failure to perform is therefore rightly based on the Clearing Agreement.

62, 110 S.Ct. at 2265 ("Unlike a common-law trust," 26 U.S.C. § 7501 creates a trust for which the IRS need not trace the money withheld by employer to pay employees' income, FICA, and excise taxes). Recent cases from lower courts across the country confirm that a person seeking a constructive trust must trace the *res* of her property to the assets of the estate. *See, e.g., First Federal of Michigan v. Barrow*, 878 F.2d 912 (6th Cir.1989); *In re Mahan & Rowsey, Inc.*, 817 F.2d 682 (10th Cir.1987); *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980); *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935 (2d Cir.1965).

■ Oxford distinguishes *Cunningham* by arguing that its fiduciary relationship with Stotler elevates it above the class of general unsecured creditors. As Oxford points out, the Court in *Cunningham* does limit its analysis to similarly situated creditors.[11] Under Oxford's theory, the commodities regulations set up the segregated account as a trust benefitting both the customers and the IBs. The Court in *Cunningham*, however, noted that even had the monies been secured by a lien, meaning that the claimants "would have been endeavoring to get their own money, and not money in the estate of the bankrupt," the claimants would still need to trace their money. *Cunningham*, 265 U.S. at 11, 44 S.Ct. at 426. Furthermore, once the *res* of a trust disappears, the obligation to pay becomes merely a personal debt, although certain fiduciary duties may remain. *See* 1 A Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 74.2 (4th ed. 1987). Per 11 U.S.C. § 766(h), however, the customers receive first priority distribution for that debt. Therefore, even if we were to

grant Oxford's fiduciary relationship theory (which we do not), we would hold that it cannot completely escape the tracing requirement.

In defining the tracing requirement, Illinois law is a bit less than precise, requiring that the *res* be identifiable as such and that the trustee have possession of it. *People ex rel. Hartigan v. Candy Club*, 149 Ill. App.3d 498, 502, 103 Ill.Dec. 167, 170, 501 N.E.2d 188, 191 (1st Dist.1986). This leaves open the question of how tight the nexus must be between the funds to be impressed and the funds originally belonging to the claimant.[12] Oxford argues only that it need not trace its funds because its rights "parallel the customer's." Response at 8. Because the customer need not trace his funds, Oxford contends, an IB need not either because the monies owing to the customer and the IB both originate from the segregated account. Oxford ignores the clear mandate of the statutory scheme, however, which we can but reiterate here: customer protection. IBs are given no comparable protection, as Oxford acknowledges. In the context of a bankruptcy proceeding, we are ill-inclined to recognize a claim whose only basis is the coattails of a separate and explicit claim. Additionally, Oxford cites no Illinois authority supporting a constructive trust without tracing the funds. *See* 4 *Collier on Bankruptcy* ¶ 541.13 (Lawrence P. King, ed. 1992).

■ Oxford cannot trace the funds owed to it by Stotler, however, because the segregated account ran a negative balance on several occasions prior to the petition date. Trustee's Statement of Facts at 4–5. On the petition date, the funds in Stotler's other accounts were traceable neither to

---

**11.** In response to Oxford's distinction of *Cunningham*, Peterson argues that the customers have a better claim of ownership of the funds in the segregated account because they once possessed those monies. It is true that this argument does not clash with Oxford's, and it fails to recognize that the customers never possessed the capital gains they accrued in the segregated account. Nevertheless, Peterson's argument does reflect the intent of 7 U.S.C. § 6d and 11 U.S.C. § 766(h), which is to treat funds in the

debtor's estate as belonging to the customer and thereby place additional restrictions on those seeking to collect from the debtor ahead of the customers. One traditional restriction has been a tracing requirement.

**12.** Illinois uses the lowest intermediate balance test in the case of secured transactions. *C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370 (1982). *Hartigan* does not explicitly refer to this test, however.

Oxford nor to the operational[13] or segregated accounts. *Id.* The monies used to subsequently replenish the account may be traced only to sources other than Oxford. *Id.* With no demonstrated nexus between the monies Oxford seeks to impress and the commissions it earned, we cannot grant Oxford a constructive trust.

> The requirements of a constructive trust in this setting may seem formalistic. But it is entirely appropriate to insist on their full rigor, since constructive trust doctrine creates a mechanism by which a creditor may attain a position roughly equivalent to a perfected security interest in proceeds without complying with the usual statutory formalities, and thus tends to undercut the statutory scheme.

*In re Auto–Train,* 810 F.2d 270, 275 (D.C.Cir.1987) (citation omitted).

### IV.

Oxford denies that it seeks to bootstrap its claim above other claims deserving higher priority. Rather, Oxford seeks its remedy "apart from the priority system." Reply at 6. Oxford offers as an analogy the lease of typewriters to a company that later declares bankruptcy. The analogy, clever though it is, has critical flaws. Typewriters, unlike money, are easily identifiable. Money, on the other hand, is fungible and has a tendency to disappear from debtor's estates. Merely claiming that the typewriter "is mine" cannot suffice where there are more owners than typewriters and the few remaining machines look alike.

Without doubt, Oxford's constructive trust theory could easily result in the IBs receiving their distributions of funds at the expense of the customers.[14] As it became clear that the estate would have enough money to pay the customers' and IBs' claims, Oxford downplayed this consequence of its theory. *Compare* Brief at 10

("Moreover, the Trustee cannot distribute to others, whether general creditors or *priority customers,* funds which do not belong to the estate.") (emphasis added) *with* Response at 8 ("Oxford's rights parallel the customer's under the commodities law framework."). While the statutory provisions do not explicitly mention whether the IBs deserve priority distribution, the intent to favor the customer could not be clearer. *See also* 17 C.F.R. §§ 190.07, 190.-08(a)(1)(ii)(J) (1991) (a customer's claim is limited to her "net equity," defined to exclude commissions owed, but the estate's other funds are to be tapped "to satisfy in full all claims of public customers.").

Oxford insists that the commissions belong to the IB from the moment of their accrual, despite the statutory requirement to treat the money as belonging to the customer. 7 U.S.C. § 6d. In light of the extensive accounting requirements imposed upon FCMs pursuant to this requirement, 17 C.F.R. §§ 1.20–1.27, the truth of Oxford's assertion would certainly entail some analogous accounting requirements.

Oxford's typewriter analogy also reveals a legitimate method to recover "apart from the priority system." Rare indeed would be the typewriter lessor who did not insist upon some form of security for the machines contracted out. As the Court in *Cunningham* noted, Oxford "could have established a lien for what was due [it] in any particular fund," *Cunningham,* 265 U.S. at 11, 44 S.Ct. at 426; if it had done so, it would be a secured creditor, fully deserving of distribution ahead of the customers.

Finally, we note again that the legislative history of 11 U.S.C. § 766 emphasizes that the risk of a broker's bankruptcy is not to be borne by the customer. S.Rep. No. 989, 95th Cong., 2d Sess. (1977) U.S.Code Cong.

---

**13.** Stotler's operational account was used to pay its routine expenses and replenished from the segregated account with the commissions Stotler earned. *See* 17 C.F.R. § 1.20(c). Monies in the operational account could therefore conceivably be traced to the segregated account. On the petition date, however, the operational account was empty. Trustee's Statement of Facts at 7.

**14.** And would certainly lead to a flood of similar claims by all IBs every time an FCM was liquidated. Bankruptcy law's priority system obviously seeks to avoid just such a chaotic rush.

& Admin.News 1978, p. 5787. Beyond what has already been said, we agree with the wisdom and efficiency of this policy for another reason. Coase's theorem about contracting around the law's assignment of risk depends on the free flow of information. Ronald H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960). Individual futures investors, however, face a formidable task in researching the relative solvency, reputation, and success of competing FCMs. Additionally, even though individual customers face the same expected value of losses and gains as do IBs, the potential losses carry much more impact because of their magnitude relative to an individual's net worth. Hence, we say that individuals are "risk averse." With limited information about the risks of loss through FCM bankruptcy, a rational investor will err too much on the side of caution.

IBs, however, can much more easily pool the risk of FCM bankruptcy. IBs deal with the FCMs more frequently and closely, and could form a pool of data about the potential insolvencies among the FCMs. That information would thus better guide their judgments about which FCMs should be avoided. Furthermore, because an IB deals with many more FCMs than would an individual investor, the expected losses due to a single FCM failure would not loom so large relative to the IB's total assets. Placing the risk of FCM bankruptcy upon the IBs over the customers ensures a more efficient collective response to that risk.

## V.

Oxford and Stotler did not operate under a fiduciary relationship. We therefore deny Oxford's claim to a constructive trust. Moreover, Oxford is not able to trace its commissions, a reason apart from the absence of a fiduciary relationship to deny the constructive trust claim. Summary judgment is granted in favor of Stotler, and denied as to Oxford. It is so ordered.