**In re AMERICAN CROP SERVICES, INC., Chickasaw Chemical Co., Inc., Debtors.**

**Novartis Crop Protection, Inc., Plaintiff,**

**v.**

**American Crop Services, Inc., and Harris Trust and Savings Bank, Defendants.**

**Bankruptcy Nos. 00–10366, 00–10367. Adversary No. 00–5273.**

United States Bankruptcy Court, W.D. Tennessee, Eastern Division.

Feb. 12, 2001.

Michael P. Coury, Waring & Cox, P.L.C., Memphis, TN, for American Crop Services.

James E. Bailey, III., Humphreys, Dunlap, Wellford, Acuff & Stanton, P.C., Memphis, TN, James E. Spiotto, Michael T. Benz, Mark D. Rasmussen, Chapman and Cutler, Chicago, IL, for Harris Trust and Savings Bank.

Charles C. Exum, Rainey, Kizer, Butler, Reviere & Bell, P.L.C., Jackson, TN, for Novartis Crop Protection, Inc.

## MEMORANDUM OPINION AND ORDER RE MOTIONS TO DISMISS FILED by (1) HARRIS TRUST AND SAVINGS BANK and (2) AMERICAN CROP SERVICES, INC.

G. HARVEY BOSWELL, Bankruptcy Judge.

The Court conducted a hearing on the Motions to Dismiss filed by the defendants in this matter on January 24, 2001. FED. R.BANKR.P. 9014. Pursuant to 28 U.S.C. § 157(b)(2), this is a core proceeding. After reviewing the testimony from the hearing and the record as a whole, the Court makes the following findings of facts and conclusions of law. FED.R.BANKR.P. 7052.

### I. FINDINGS OF FACT

1. On January 31, 2000, American Crop Services (the *"Debtor"*) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.*

2. As of the petition date, the Debtor was indebted to Harris Trust and Savings Bank (*"Harris Bank"*), as itself and as agent for two other lenders, for over $28 million pursuant to certain loan and security documents (the *"Prepetition Indebtedness"*.)

3. The Prepetition Indebtedness was secured by security interests granted by the Debtor to Harris Bank in virtually all of the Debtor's assets, including, without limitation, certain real property, bank accounts, inventory and accounts receivable, and the proceeds thereof (collectively, the *"Collateral"*). The Court ultimately found that Harris Bank perfected its liens and security interests in the Collateral through, among other means, appropriately executed and filed mortgages, fixture filings and UCC–1 financing statements.

4. On February 18, 2000, the Court approved the sale of the Debtor's assets (the *"Sale"*) to Royster–Clark Resources LLC (the *"Purchaser"*). The Court entered an Amended Order Approving the Sale on February 24, 2000.

5. On February 18, 2000, the Court also entered the Final Cash Collateral Order, which authorized the Debtor to use cash collateral pursuant to the terms of the Cash Collateral Agreement entered into between the Debtor and Harris Bank.

6. On February 25, 2000, the Committee of Unsecured Creditors (the *"Committee"*) filed a supplemental objection (the *"Supplemental Objection"*) to the Debtor's use of cash collateral. The Court held a hearing on this objection on February 28, 2000.

7. On the same day, the Committee filed an adversary proceeding (the *"Committee Adversary"*) to determine the extent, validity and priority of certain liens, claims and encumbrances of Harris Bank, including Harris Bank's security interests in the Debtor's bank accounts.

8. Following the hearing on the Committee's objection, the Court entered an Order on April 4, 2000, in which the Court found that Harris Bank was entitled to receive all of the net proceeds of the Sale, with the exception of $584,000 which represented the value of certain real and personal property which the Court determined was not subject to the prepetition liens and security interests of Harris Bank. The Court directed Harris Bank to segregate these excepted funds in an interest bearing account at Harris. Bank, subject to the Replacement Liens and further Orders of the Court.

9. Harris Bank filed a Motion for Release of Escrow Funds on June 9, 2000, which was granted by the Court on July 3, 2000.

10. On June 2, 2000, Harris Bank filed a Motion for Summary Judgment as to all claims set forth in the Committee Adversary complaint. On June 21, 2000, this Court heard oral arguments on the motion and concluded that Harris Bank was entitled to summary judgment against the Committee on all claims set forth in the Committee Adversary complaint. The Court subsequently entered its Order Granting Defendant's Motion for Summary Judgment (the *"Summary Judgment Order"*) on July 19, 2000.

11. At the hearing on the summary judgment motion, the Court found that Harris Bank possessed valid, perfected security interests in the Collateral, including the Debtor's bank accounts.

12. On June 13, 2000, Novartis Crop Protection, Inc., (*"Novartis"*) filed a Proof of Claim in the Debtor's bankruptcy proceeding purporting to "claim[ ] ownership of" $91,142.30 that Farmers Gin Company ("Farmers Gin") allegedly paid to the Debtor as a result of a Bulk Plus Marketing Agreement (the *"Marketing Agreement"*) between Novartis and the Debtor. Under this agreement, the Debtor acted as a marketing representative for Novartis and the Debtor agreed to remit to Novartis payments that it received on account of the Debtor's sales of Novartis' products.

13. A review of the Marketing Agreement reveals that Harris Bank is not a party to the Agreement.

14. The Marketing Agreement does not contain any provision that any monies the Debtor received on account of sales of Novartis' products would be deposited or "held in trust" for the benefit of Novartis

at Harris Bank. Novartis has not alleged the existence of any contractual or other relationship between itself and Harris Bank, nor has it alleged any facts from which it can be inferred that Harris Bank knew or should have known of such an arrangement or that Harris Bank was obligated to hold any such funds in trust for the benefit of Novartis.

15. On August 18, 2000, Novartis filed this adversary proceeding in which, *inter alia,* it seeks a judgment against the Debtor and Harris Bank based on an alleged claim of conversion. In the complaint, Novartis alleges that Farmers Gin bought $91,142.30 worth of product (the *"Invoice Amount"*) from Novartis pursuant to two invoices (the *"invoices"*) dated July 30, 1999, and August 16, 1999. The invoices add up to $97,070.40. No explanation was given for the difference between the invoice total and Novartis' claim.

16. Novartis further asserts, based on alleged representations made by Farmers Gin to Novartis, that Farmers Gin paid the Debtor $100,000 for the product that Farmers Gin bought from Novartis by three separate checks (each listing Farmers Gin as drawer and the Debtor as payee) dated September 30, November 12, and November 30, 1999. One of these checks was in the amount of $50,000 and the other two were in the amount of $25,000 each (the *"$100,000 Sum"*).

17. Separate from any alleged Novartis relationship, prepetition, Farmers Gin was an accounts receivable obligor to the Debtor for a large sum.

18. In the Complaint, and especially in light of the open account receivable that existed between the Debtor and Farmer's Gin separate from any alleged Novartis relationship, Novartis does not allege any explanation of or reasons for the disparity between the Invoice Amount and the $100,000 Sum or for the fact that three checks denominated in amounts that do not correspond with the two invoices allegedly constitute payment of the Invoice Amount by Farmers Gin to the Debtor.

Nonetheless, Novartis alleges that the Debtor should have paid the Invoice Amount to Novartis from the $100,000 Sum that it received from Farmers Gin pursuant to the Agreement.

19. Novartis claims that the Debtor never paid the Invoice Amount to Novartis from the $100,000 Sum the Debtor received from Farmers Gin.

20. Novartis further alleges that the Debtor deposited the checks (the $100,000 Sum) into its deposit account at Harris Bank (the *"Harris Account"*).

21. Novartis asserts that it is entitled to the Invoice Amount from Harris Bank because it was allegedly "held in trust" for the benefit of Novartis after being "inadvertently swept" from the Harris Account by Harris Bank.

22. Novartis alleges in their adversary complaint that, "[u]pon information and belief, the Debtor's various accounts with Harris Trust and Savings Bank were regularly swept by Harris Trust and Savings Bank pursuant to an agreement with [the Debtor]." Novartis further alleges that the Invoice Amount "may have been inadvertently swept from the Debtor's bank account by [Harris Bank]."

23. These allegations are directly contradicted by this Court's prior findings. The undisputed evidence on which this Court granted summary judgment against the Committee demonstrates that the Debtor maintained twelve bank accounts at non-Harris banks (the "Deposit Accounts"). The Debtor deposited funds it received on account of its sales into either the Deposit Accounts or into one of several operating accounts the Debtor maintained at Harris Bank, including the Harris Account. Because Harris Bank's debt was secured by the cash proceeds of its collateral, Harris Bank and the Debtor agreed that the Debtor would cause funds that were deposited into the Deposit Accounts (non-Harris Bank) to be swept periodically into the Debtor's accounts at Harris Bank.

The Debtor would then withdraw funds from its accounts at Harris Bank (including the Harris Account) to pay for its ongoing business operations until it could be sold.

24. It is undisputed during the relevant time period, September 1999 to early December 1999, that Harris Bank never "swept" or took money out of the Harris Account. To the contrary, it was only money from non-Harris accounts that was "swept" into the Harris accounts by the Debtor, until the Debtor withdrew it to pay its expenses. Assuming the $100,000 Sum was deposited by the Debtor directly into the Harris Account, there is no conceivable way that this amount could have ever been "swept" as Novartis alleges, because the only accounts that were "swept" were the non-Harris Deposit Accounts.

25. Further allegations in Novartis' complaint are also baseless in light of this Court's prior finding that during the relevant time period (pre-petition), the Debtor was permitted to use the funds in its accounts at Harris Bank to fund its business operations. Consistent with the Final Cash Collateral Order, the Debtor withdrew money from the Harris Account to pay its expenses. Moreover, post-petition, the only proceeds that were distributed to Harris Bank were sales proceeds realized from the sale of the Debtor to Royster–Clark.

## II. CONCLUSIONS OF LAW

### A. Illinois Substantive Law Governs This Dispute

Courts in this Circuit have differed as to whether state or federal choice of law rules should apply to a bankruptcy court sitting pursuant to federal question jurisdiction. *See In re SMEC Inc.,* 160 B.R. 86, 91 (M.D.Tenn.1993) (bankruptcy court should apply federal choice of law provisions); *In re Elder–Beerman Stores Corp.,* 221 B.R. 404, 408 (Bankr.S.D.Ohio 1998); *but see, In re AVN Corp.,* 248 B.R. 540, 548 (Bankr.W.D.Tenn.2000) (in multistate dis-

pute, bankruptcy court will generally apply forum state choice of law principles). Federal courts generally apply the "most significant contacts" inquiry as set forth in *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161–62, 67 S.Ct. 237, 91 L.Ed. 162 (1946) in determining which state law should be applied. *See, e.g., SMEC, Inc.,* 160 B.R. at 89–91. Similarly, Tennessee courts apply the Second Restatement's "most significant relationship" test. *See Hataway v. McKinley,* 830 S.W.2d 53, 56–58 (Tenn.1992); *AVN Corp.,* 248 B.R. at 551.

 Under either state or federal choice of law principles, a court should look at the "significance of the relationship of a state with the occurrence and the parties." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1989). Using the "most significant relationship" test, courts can look to a number of factors in determining which state law can apply, such as: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence or place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Charash v. Oberlin College,* 14 F.3d 291, 297 (6th Cir.1994). In *Charash,* the Sixth Circuit applied the "most significant relationship" test to a conversion action and found that the law of the state where the alleged conversion was completed should apply and that the alleged conversion was completed when the defendant exercised dominion and control over the property without the owner's consent. *Id.* at 297. *See also, Dethmers Mfg. Co., Inc., v. Automatic Equip. Mfg. Co.,* 23 F.Supp.2d 974, 1004–05 (N.D.Iowa 1998)

 Applying the "most significant relationship" test to Novartis' claim for conversion against Harris Bank dictates that Illinois law should be applied. As in *Charash,* any conversion which Novartis alleges against Harris Bank would have occurred in Illinois. Novartis alleges that Harris Bank allegedly converted funds by "sweep-

ing" the funds contained in the Debtor's account at Harris Bank. The Harris Account was maintained by Harris Bank in Illinois. Accordingly, the $100,000 Sum was located in Illinois once it was deposited there by the Debtor. Novartis alleges that Harris Bank completed the last act of alleged conversion—exercising dominion and control over the alleged property of Novartis—in Illinois, *viz.*, when the funds comprising the Invoice Amount were deposited by the Debtor into the Harris Account and then allegedly "swept" out of the account by Harris Bank. Under the *Charash* holding, therefore, Illinois law should apply in this dispute.

### B. Novartis Has Not Stated A Claim For Conversion Against Harris Bank

■ In order to state a claim for conversion under Illinois law, a plaintiff must allege the following elements: (1) that it has a right to the property; (2) that it has an absolute and unconditional right to the immediate possession of the property; (3) that it made a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion or ownership over the property. *See Cirrincione v. Johnson*, 184 Ill.2d 109, 234 Ill.Dec. 455, 703 N.E.2d 67, 70 (1998); *In re Thebus*, 108 Ill.2d 255, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1260 (1985); *Western States Ins. Co. v. Louis E. Olivero & Assocs.*, 283 Ill.App.3d 307, 218 Ill.Dec. 836, 670 N.E.2d 333, 335 (1996).

### 1. Novartis Has No Standing to Bring a Conversion Claim

■ Novartis does not have standing to sue Harris Bank for conversion because, as a matter of law, it cannot allege the first two elements necessary to state a claim for conversion, namely, that it had a right to the funds when they were deposited into the Harris Account and an absolute and unconditional right to the immediate possession of such property. In their complaint, Novartis alleges that it was owed

money from the Debtor pursuant to the Agreement. Novartis's relationship with the Debtor purportedly derives from the Agreement between those two parties and does not involve Harris Bank in any way. The Agreement does not contain any provision requiring any monies received by the Debtor on account of sales of Novartis product to be deposited or "held in trust" for the benefit of Novartis at Harris Bank. Novartis has not alleged the existence of any contractual or other relationship between itself and Harris Bank, nor has it alleged any facts from which it can be inferred that Harris Bank knew or should have known of such an arrangement or that Harris Bank was obligated to hold any such funds in trust for the benefit of Novartis. There are simply no facts that have been presented to the Court which establish any relationship between Novartis and Harris Bank.

■ The Debtor allegedly placed the money it received from Farmers Gin in the Harris Account. At that point, as a matter of law, the Debtor and Harris Bank established the relationship of creditor and debtor. "As a rule, when money is deposited with a bank, title to it passes and the bank becomes a debtor to the extent of the deposit; and to that extent, the depositor becomes a creditor." *Katz v. Belmont Nat'l Bank of Chicago*, 112 Ill.2d 64, 96 Ill.Dec. 697, 491 N.E.2d 1157, 1159 (1986) (citations omitted). Importantly, as the Illinois Supreme Court found in *Katz*, "the only possible right to immediate possession of the property, absolute and unconditional, [is] on [the Debtor's] part." *Id.*

In *Katz*, the owner of a small business sued a bank for conversion to recover funds which the business owner gave to the bank's customer and depositer, a payroll service company. The bank's relationship with the payroll service company was a typical banking relationship where the payroll service company would deposit funds that it received from its customers into its account with the bank, and, in turn, draw payroll checks therefrom to pay its

customers' employees. The *Katz* court found that there was no relationship between the customers of the payroll service company (*i.e.*, the business owner) and the bank and that, with respect to the funds in the payroll service company's account, "[t]he only possible right to immediate possession of the property, absolute and unconditional, was on [the payroll service company's] part." *Id.* The court then dismissed the business owner's claim for conversion against the bank because it could not satisfy this essential element, even though the business owner alleged that the funds deposited into the bank were not property of the payroll service company. *Id.*

Applying the rationale of *Katz* to the facts alleged here, "[Novartis's] right in the property and its possession would have to be asserted by [Novartis] against [the Debtor], because [the Debtor] was the party to whom [Novartis] entrusted [its] funds, not [Harris Bank]." *Id. See also Miller v. First Granite Nat'l. Bank*, 349 Ill.App. 347, 110 N.E.2d 651, 652–53 (1953) (in action by third parties against bank for funds held in depositor's name, court held that bank is not obligated to defend suit; rather proper course is to sue depositor). Therefore, following *Katz*, because a necessary element of a cause of action for conversion could never be established by Novartis against Harris Bank, this Court finds that Novartis's complaint fails to state a cause of action for conversion. Under *Katz*, it is the Debtor, and not Novartis, that maintains an absolute and unconditional right to immediate possession of funds held in the Debtor's bank accounts. It is legally impossible for Novartis to establish these elements in an action for conversion against Harris Bank and, as a result, Novartis has not standing to bring this claim.

## 2. A Constructive Trust Cannot be Created Under These Circumstances

■ At the hearing in this matter and in its response to Harris Bank's motion, No-

vartis also attempted to avoid the infirmities of its conversion claim by suggesting that it is entitled to the funds in question under a constructive trust theory. Specifically, Novartis alleges that "the funds collected by the Debtor on behalf of Novartis for the sale of Novartis's products were never property of the debtor or the debtor's estate and, as such, should not be subject to the lien claimed by Harris Bank." According to Novartis and despite the clear conclusions of the Court in numerous orders, the property was not a part of the Debtor's estate because it was held in constructive trust for Novartis.

In the case of *XL/Datacomp, Inc., v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir.1994), the Sixth Circuit Court of Appeals stated unequivocally that "constructive trusts are anathema to the equities of bankruptcy since they take from the estate . . ." *Id.* at 1452. In *Omegas Group*, the creditor sought to elevate its position in the bankruptcy by asserting that the funds it gave the debtor constituted a constructive trust. *Id.* at 1448. The court rejected this attempt, reasoning:

Unless a court has already impressed a constructive trust upon certain assets or a legislature has created a specific statutory right to have particular kinds of funds held as if in trust, the claimant cannot properly represent to the bankruptcy court that he was, at the time of the commencement of the case, a beneficiary of a constructive trust held by the debtor.

*Id.* at 1449. The Sixth Circuit thereafter quoted from a Northern District of Illinois case and found that constructive trusts are fundamentally at odds with the general goals of the Bankruptcy Code. *Id.* at 1451 (quoting *In re Stotler and Co.*, 144 B.R. 385, 389 (N.D.Ill.1992)). Thus, the court held that the funds allegedly held in constructive trust were a part of the estate which should be ratably distributed to all of the creditors. *Id.* at 1452.

Contrary to the clear holding of *Omegas Group,* Novartis attempts to enhance its pre-petition position as an unsecured creditor by asserting that the funds held by the Debtor were, due to the commission of a wrongful act, held in trust by the Debtor for Novartis's benefit. The Sixth Circuit's Omegas Group decision dictates that such an attempt cannot succeed. According to the court, § 541(d) of the Bankruptcy Code does not permit a claimant to attempt to impose the remedy of a constructive trust for alleged fraud and thus take ahead of other creditors or the trustee. *Id.* at 1451. Such an attempt would be in contravention of the Bankruptcy Code. Instead, the court acknowledged that "each creditor has suffered disappointed expectations at the hands of the debtor; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement." *Id.* at 1452–53; *see also In re Gurley,* 222 B.R. 124, 135–36 (Bankr. W.D.Tenn.1998).

■■■ Notwithstanding the inapplicability of the constructive trust theory under these circumstances, even if a constructive trust was recognized by this Court, Novartis cannot establish the necessary elements for its imposition. In order to impose a constructive trust, Novartis must demonstrate that Harris Bank has retained the property by way of fraud or inequitable conduct and, under principles of equity, should not be allowed to keep it. *See Covert v. Nashville, C & St. L. Railway,* 186 Tenn. 142, 152, 208 S.W.2d 1008 (1948). Novartis attempts to fulfill this requirement by alleging that the Debtor's failure to "segregate and remit the funds" constituted the wrongful conduct and the enforcement of Harris Bank's prior perfected security interest "should not allow Novartis to forfeit its rights in its funds." Further, Novartis contends that this Court should "logically infer" that Harris Bank

received Novartis's alleged sales proceeds which were being held by the Debtor notwithstanding the fact that the Court ordered such proceeds to be paid to Harris Bank pursuant to the April 4 Order and Escrow Release Order.

Novartis's logic is seriously flawed. These allegations do not satisfy the requirements for the imposition of a constructive trust. The Court has previously recognized, in the "Final Cash Collateral Order", that Harris Bank maintained a priority security interest in virtually all of the Debtor's property allowing it to receive nearly all of the sale proceeds. Moreover, the Court has also recognized, in the "Escrow Release Order", that Harris Bank maintained perfected priority replacement liens which entitled it to the $584,000 which was contained in the escrow account. Finally, the undisputed record before the Court further establishes that the Debtor spent the money it received during November and December to funds its business operations. These findings by the Court reflect the priority position that Harris Bank held in the Debtor's bankruptcy. Thus, Harris Bank did not act inequitably by properly exercising its rights as a secured creditor to receive the proceeds of the collateral securing its interest.

Through the improper imposition of a constructive trust, Novartis attempts a post-petition enhancement of its unsecured status. If this Court allowed such an enhancement, each and every unsecured creditor in bankruptcy would argue that funds held by the Debtor, were, in fact, held only in trust by the Debtor for payment to the unsecured creditor. Creditors would seek the imposition of a constructive trust to sidestep the absolute priority rule in bankruptcy. A result such as this would strip Harris Bank of its bargained-for position as a secured creditor and post-petition financier to the Debtor. This Court simply will not allow such a result. Novartis is not entitled to recover under a theory of conversion, but rather to file a

proof of claim as an unsecured creditor and to share in the distribution, if any, of the Debtor's assets.

### III. ORDER

It is therefore **ORDERED** that the Motions to Dismiss filed by Harris Trust & Savings Bank and by the Debtor are **GRANTED. The Complaint is hereby DISMISSED.**

**It is so ordered.**